On behalf of the plaintiff-appellant Gul Jaisinghani, may it please the Court, with the Court's permission, I will be attempting to reserve five minutes on rebuttal. Well, you've got ten minutes, that's okay. The District Court erred when it determined that Mr. Jaisinghani's case was barred because its decision was based on an incorrect statement of California law. Namely, the District Court essentially held that a party's participation in a settlement which results in that party's dismissal will automatically bar that plaintiff from pursuing a malicious prosecution claim. And foreclosing any examination of the reasons for that dismissal. That's an incorrect statement of California law. The California courts have held that under some circumstances, even where a party technically participates in the settlement, and let's say some parties pay some money but other parties do not, that under some circumstances, that dismissed party will not be barred from pursuing a malicious prosecution claim. I have a question. Yes, Your Honor. Why are we looking at California law on – isn't ultimately the question of whether this is a favorable determination or not a matter of Federal law? It is, and that's an excellent point. Recently, this Court addressed that issue of the favorable determination in the Awabdi case that was handed down just this year. And that case talked about the fact that – specifically held that a dismissal in and of itself – I'm sorry, a dismissal for – in the interest of justice will not bar a malicious prosecution claim. The issue of favorable determination, though, it appears that most of the courts that have addressed the issue have applied State law. The – Are they applying it or are we just looking to it for – Looking for guidance. Fine. The cases that we've cited and the cases I'd like to highlight to your attention are three cases. One from California, but also another one from Pennsylvania, and another one from the Third Circuit. And with those cases, and if we look at them as a body of law, and we could say, in a sense, we're – you know, we are applying – we're applying Federal law in the sense of what is it that bars a Section 1983 action applying the general guidance that was handed down by Awabdi, but more specifically looking at, well, what happens if a party technically participates in a settlement? And what the courts have said, including the California courts, but also other courts, is that there are two factors you want to look at. First, was that dismissal required by the other parties as a condition of the settlement? Was one party saying they had to have that party dismissed, and that – That's not the case here. That he had to pay the $150,000 fine. That's not the case. Or at least guarantee it. That is exactly – that is not the case. First of all, he did not have to pay anything. He pled to nothing, but he was not required to pay anything. The case was dismissed against him, but the reason this is not a guarantee, the reason the district court was – is because, number one, with the time that the dismissal was made, these cashier's checks were already made out. They were there at the court. And if you look at the record, it had already been confirmed that they had already been confirmed that they were legitimate and that there was no stop order or anything like that. Who paid the money? The – who paid the money was the other defendants who pled guilty, Jack Rust, Art Vias, and the company International Classics. I thought that Mr. – I thought Jaisinghani took out a loan for which he was responsible. The testimony by Mr. Jaisinghani was that the fundraising companies – he was a consultant of those fundraising companies, but he was not an owner or director – that they loaned the money to Jack Rust, Art Vias, and the company International Plastics because that company was providing plastic bags. There is no evidence in the record that that money came from Mr. Jaisinghani. I mean the money used to pay the fine. That's what I'm talking about as well. The checks were paid from fundraising companies. Isn't there a deposition – in the deposition where he says, you told me that these payments were due to you, and you said that you were obligated to pay these amounts. Is that correct? Absolutely with interest? There is also – Who's you? You was him. Yes. Yes. He was obligated to pay the loans. He had – there was some conflicting testimony, and I think there was some – there may have been some misunderstanding in terms of the questions. Well, whatever it is, the district judge was certainly entitled to rely on that statement to conclude that he was entitled to pay – that he was obligated to pay the loans. He said he was. That he – the checks were made from the fundraising company. He may have testified that he or his fundraising companies – I think that you was the fundraising companies, but even assuming it was him, that he loaned the money, but in that sense he did not pay the money because the money was from – My question is why did you pay International Plastics fines for them? International Plastics had no money. I don't understand. I'm not – why it fell to you as opposed to someone else to pay the fines. Art had no money. Jack had no money. International Plastics had no money, and that's why it ended up to me. So he was paying the fine. If you will, I'll refer the Court's attention to the testimony where it was stated that the money came from the fundraising companies, to which he was a – just simply a consultant. But they had no money. Well, Jack Rust and Art Bias had their own attorneys, and they did have – they had money, and they were the ones who were pleading guilty and required to pay the fines. There was no requirement as part of the settlement that Mr. Jaisinghani pay anything. So what we're looking at is what were the terms of this dismissal, and what were the reasons that Mr. Jaisinghani was dismissed. The reason that Mr. Jaisinghani was dismissed was because, as the prosecutor himself testified, they had determined that there was no evidence against him. He said it – Mr. Fentis said it to a newspaper, and he confirmed it in his deposition. And that is – that's on the record in docket number 106 at page 19. So the prosecutor had determined this. The question then is, not only was the money already paid at the time of the settlement. Well, that's not true either, because apparently they hadn't cleared, and that's why everybody was talking at the plea agreement about the contingency, that if the checks do not clear, as outlined for the court, then the complaint is reinstated in full as to all charges as to Mr. Jaisinghani. That these would be the – there wouldn't have to be a preliminary hearing. They won't object to the fact they didn't have a preliminary hearing, and everything will be reinstated within 38 days. So there was a quid pro quo. And even though the cashier's checks was that, there was still a contingency that people were concerned about that they wouldn't clear. There was a – there was a contingency that people were concerned about, yes. The question is, did Mr. Jaisinghani, under the State or Federal case law, give up something of value? The reason he didn't – When he apparently did, he gave up the right if they reinstated the complaint to a preliminary hearing as he would have otherwise been entitled to. The reason that that is essentially meaningless is because, number one, as I mentioned, on page 7 of the transcript, it had been confirmed that the cashier's checks were good and they were – there was no stop payments. But assuming there was some condition, this condition was – this was ancillary to the settlement. The settlement was that these other defendants pled guilty and that they were required to pay the money. The government had decided, because it lacked evidence, they were going to dismiss it. So the question, Your Honor, is what would have happened, let's say, if the – But the problem is – isn't the problem they didn't just dismiss it. They dismissed it contingently on these checks being paid. Actually, it wasn't. If you read the record, it was dismissed as of that date. And the only contingency was that if the checks theoretically didn't clear, which they couldn't because it was a cashier's check, but if they theoretically didn't clear, then the government would have the right to reinstate the charges. And the reason that that's meaningless is for two reasons. Number one, as we argued in the briefs, whether or not they paid them or not, the government was entitled to refile the charges either way, even if – even if the payment was paid, the government still could have refiled the charges. But more importantly, the question is, what would have happened if they had been paid? Okay, let's say – I'm sorry, I'm sorry. The question is, what would have happened if they had not been paid? Let's say that the checks theoretically had not cleared. The government had already decided, as the prosecutor testified, they didn't have enough evidence against Mr. Jaisinghani. The government had already essentially abandoned the case. The government, not only did they not require Mr. Jaisinghani personally. Where is that evidence on the record? In page – docket number 106, page 19 of the record, where Mr. Fentis is asked the question. Fentis was the prosecutor. And he was – he was asked at – on page 19 of his – I'm sorry, 106. And let's look at the statement, question, and let's – on page 19 of 106, it's actually 42 of the transcript. Quoting from a newspaper article, quote, this is the question. The same charges were dismissed against Gul Jaisinghani, age 63, of Long Beach, quote, because we thought he was the owner of the company, but he distanced himself so much of it that we can't prove it, end quote, Fentis said. Jaisinghani says his daughter now owns the company, Fentis said. Question, are those the statements that you made to the reporter? Yes. Answer, yes. Question, and is that an accurate statement, that you thought that Mr. Jaisinghani was the owner of the company, but that he distanced himself so much from it that you couldn't prove it? Answer, absolutely. So that was his testimony, the prosecutor. They didn't have the evidence. But not only did Mr. Jaisinghani, was he not required to pay – But they didn't have the evidence of his owning the company. Is that all? That – they didn't have – what they did was the two defendants who pled guilty, pled guilty to treating the materials, to adding materials to them to make them come within the hazardous waste violations. They did not have the evidence that Mr. Jaisinghani was personally involved with that, that he had been involved with that. Well, that's not what the prosecutor said. The prosecutor just said that he didn't have enough evidence to show that he was the owner of international plastics. Those drums at the time were in the name – were owned by and in the name of international plastics. So that is why – Well, that isn't – the other two, Rust and so forth, they weren't the owners of international plastics either. That's right. But there was evidence that they had personally gone there and personally done the mixing. What I'm saying is the prosecutor didn't say, I don't have enough evidence against Jessica. He said, we can't prove it. Prove what? We can't prove that he was the owner of the company. Yeah. That's my point. And that he was asked – he was asked by the reporter and by me at the deposition, why were the – why were the charges against him dismissed? The quote is, the charges were dismissed against Mr. Jaisinghani because we thought he was the owner, but we – he distanced himself so much that we can't prove it. So that – I don't – I think respectfully that that's clear that the prosecutor is saying we can't prove whatever it was which was an essential element. But not only was he not required to pay anything, but importantly, he was not required to do anything with these materials. This whole case was about these 80 drums of materials that were sitting there on the docks. And not only did they say, we don't have enough evidence to prove he's related to this company, not only did they say, we're not going to require him to pay a dime. But unequivocally, they also said unequivocally and four or five times at the plea agreement that if these checks are stopped or for any reason don't clear and they – despite your assurance that they weren't worried about it, they were obviously worried about it because they kept saying it over and over again, then they were going to reinstate the charges. So whatever they may have told the newspaper, that was the deal. The deal was no – the checks don't – the money doesn't come in by reinstating  You have to – you have to give up something of value. It's not only – in these other cases, in the Fuentes case, in the Hilferty case Well, they also said, by the way, that my understanding is that the people will move to dismiss the complaint in its entirety permanently and forever against Mr. Jenkin. God, is your representation that they could have come back anyway doesn't seem to be so as to what the understanding was. Well, the question is, was that an enforceable agreement to have I don't know that. But, I mean, this is exactly why, as I understand it, in these kinds of cases, you simply look in a very ministerial way as to whether there was any consideration, essentially. Because it's very difficult to make post hoc judgments as to anything more discreet than that. But when you look at what is the consideration, nothing was being paid, no promise was being made by Mr. Jaisinghani that he would pay anything. $150,000 was being paid. But he did not promise to pay anything. But he promised that if it wasn't paid, he was going to be back in court. But it was their – they could do that anyway. It was their decision. Where did the money come from? The money came from, there's evidence in the record, it came from the fundraising companies to which he was a consultant. They loaned the money. For him. To Jack Rush. But he said that he was – he said specifically that he was on the hook by the money. In one part of his testimony, he did – All right. So that's enough – isn't that enough for the judge to come to a conclusion she came to? No, it's not. Because the question is, who's obligated to pay it? Whatever arrangement they had is separate. The question is, who is on the hook for the money? The fact that there was a decision by either Mr. Jaisinghani or the fundraising company to go ahead and loan it is separate from the terms of the settlement. Let's – we'll hear from the – If you look – On the other side, you know, you now owe us – I'm at 150,000 seconds. I've got six minutes remaining. Is that right? No, you only have ten to start with. Right. That's – you're in the hole, see? Okay. It went over. You're over six minutes. Thank you. Yeah. Thank you, Your Honor. You're reading it backwards. How much time can I have then on rubato? Well, we'll see. Thank you. Good morning, Your Honors. Tom Buck, the United States Attorney's Office, on behalf of Ken Duggar, Special Agent of the EPA. I would like to reserve for Mr. Glick, who is with the County Counsel's Office of Los Angeles, two minutes. So I will attempt to speak eight minutes, and if it pleases the Court, I will try to stay out of the hole. I would like to address first two matters that the Court has addressed with respect to Mr. Jaisinghani's presentation. The first point is that I do believe that California law of malicious prosecution elements do apply in this instance. And the Ninth Circuit's decision, which was cited by appellant, the Awabi case, specifically states that because the California malicious prosecution elements have been incorporated into the Section 1983 action of the same kind that we deal with here, we do apply California laws to those elements. And that's set forth at the beginning, as well as other California cases are set forth at the beginning of that discussion in that case. Secondly, with respect to Mr. Fentus's statement in the deposition that was read by Mr. Aswin, Mr. Fentus was a deputy city attorney of the City of Long Beach. He was not the prosecutor who took the plea or with the judge took the plea that Mr. Aswin was also citing. That was Mr. Coletta, a deputy district attorney. And the Court's transcript will reflect that Mr. Coletta was the one who took that very clearly stated conditional plea. And it was stated any number of times throughout that transcript that it was a conditional plea as part of a global settlement. Global settlement was the term the judge used. Global settlement was the term that Mr. Coletta agreed to. They also both used the term conditional dismissal as to Mr. Jaisinghani. This action arises out of a criminal investigation and prosecution for shipment of California hazardous waste to a bogus buyer in India. I say California hazardous waste because in 1995 there was a test performed on the drums, the 80 drums that were ultimately sent sail toward India. Those 80 drums were tested at the direction of the deputy district attorney. The test performed was a toxicity test called California bioassay or fish test that failed. The contents of those drums failed that test. And that is why it is California hazardous waste. There was a bogus buyer in this instance, namely the A.G. Trading Company. The A.G. Trading Company did not exist at the time that ship set sail. And if the Court looks at the first complaint filed by Mr. Jaisinghani and the defunct nonexistent corporation IPP that he was acting on his behalf, that complaint specifically states that the buyer was located in 1995. The buyer was A.G. Trading. But presumably there had to be some problem in proving the case against Mr. Jaisinghani because he was the one person who was dismissed. Well, clearly what Mr. Fentis stated was correct. And the problem was in proving that he was the owner of the company. But as the Court points out, you don't need to prove that he's the owner of the company in order to prove that Mr. Jaisinghani was guilty of transporting hazardous waste. I'm not saying that any case against Mr. Jaisinghani would be easy to prove because he kept the pieces moving pretty well. And as the record reflects in this case, there were lots of pieces to this. And I can understand very well where the Deputy District Attorney decided to settle this case in order to get $150,000 to recoup the investigation costs. But at the same time, there was certainly no dismissal in the interest of justice and the representation as to Mr. Jaisinghani. That dismissal in the interest of justice was as to the remaining counts as to those defendants who pled to a single count. At that point, the Court said yes, or the prosecutor said yes, we'll dismiss those in the interest of justice. But as to Mr. Jaisinghani, it was a conditional dismissal and never were the words spoken that it was in the interest of justice. It was in the interest of pragmatism. Now, the AG Trading Company denied this. Kennedy. Was it in the interest of $150,000? Gannon. Exactly. Exactly. I don't want to go in the hole. Unless the Court has further questions, I would reserve whatever time I leave other than that time which would be taken by Mr. Gluck.  Well, isn't there as a ---- Gannon. I'm sorry. Kennedy. Well, I mean, you would think that in a situation like this that the prosecutor would think that, well, maybe we ought to get a representation from the gentleman who's paying the $150,000 that, you know, he weighs any claims against, you know, the government. Well, Your Honor, when we read these malicious prosecution cases ---- I mean, that's what they normally do. Well, unfortunately, the malicious prosecution cases we read, usually that is not what has happened, and that's why there's a malicious prosecution case subsequently filed. So somebody dropped the ball. Well, you could argue that that would have been best if, in fact, releases had been obtained. But they weren't, and that's the record that we live with. Unless the Court has further questions, we would submit. All right. Thank you. We have another gentleman here with a couple minutes. Good morning, Your Honor. My name is Peter Glick. I'm with the County Counsel's Office. I represent Patrick Byrne. If it pleases the Court ----  I'm sorry, Your Honor. If it pleases the Court, briefly, the Court has asked about the possibility of why we're applying California law. I suggest an additional reason to what my learned counsel suggested, co-counsel suggested, was we also want to look to the effect of that particular judgment as far as we're going to apply the California law, because that's the ---- Well, that makes sense with regard to the question of whether there was actually any consideration. That certainly makes sense. But as to the ultimate question of whether there was a favorable determination ---- The Court's absolutely correct in that respect. I'm going to suggest to the Court that the case suggested by counsel in his brief, Casa Herrera, suggests that any settlement doesn't necessarily be negotiated, doesn't need to necessarily be a contract, is a valid ---- prevents a favorable showing of a favorable determination. And there's a case, Crawley, that is referred to and relied upon that says we don't go behind the judgment itself to look at extra judicial matters to decide whether, in fact, this was, in fact, a settlement. And Villa v. Cole says that we don't even look to the idea of consideration in reaching this particular decision. In fact, in Villa v. Cole, the Court said, similarly, the actual amount or subjective value of the consideration given by, and this is one of the parties, as part of the settlement agreement to the city and its co-defendants, including Villa, is immaterial to any consideration whether Villa can show termination of the lawsuit in his favor. I suggest to the Court what we had here was counsels referred to it as a global settlement. I suggest that State courts refer to it as a job settlement. The way you said, and only that, the dismissal was against Giacostani, period, without any obligation to just say anything about that. We don't even need to examine that. So long as we have a ---- We have to look at the consideration, don't we? No. That's what Villa says. Well, if ---- Well, that's not what you read. What you read is, what it said was that it doesn't matter the amount and so on. It doesn't matter that there be nothing. That's different. Immaterial as to any consideration. And I suggest in this particular case, which you had was a joint settlement of the particular criminal case, that Mr. Giacostani, through his attorney, actually agreed to. If you read the order in which the settlement was discussed by the court, you look at the plea. He says, the court turns to the district attorney and says, tell us the terms of the settlement in agreement. He lays out the terms in the first two pleas and the fact that they're going to be paying money. And the court then turns and ---- Then who's going to be paying money? It says the ---- I suggest it's Mr. Giacostani. Well, you're suggesting, but what does that say? Who's going to pay the money? I suggest that he paid the money. I know that's what you suggest, but what does the settlement say? The settlement says that these particular fines will be paid. I mean, not the fines, but the restitution of investigative costs will be paid. And he, Mr. Werxman, presents the checks to the court. There is nothing in the record itself that says where these particular settlements come from in the record of the judgment of the plea. I suggest that ---- Well, I guess that's my point. I think we have to be looking at the consideration. Otherwise, we don't get to Mr. Giacostani. Well, I ---- okay. I suggest that we have a global settlement. In other words, we have three pleas, payment of $150,000. That was the consideration for the dismissal by the district attorney of the case as against Mr. Giacostani. Well, you only got three pleas. Three pleas and a payment of $150,000. Yeah, but it doesn't say who pays that. That's what I'm suggesting. Via versus Cole indicates that ---- Well, then how do we get Giacostani at all? Because it's a joint plea file. In other words, all four of the defendants were ---- He didn't plead. He doesn't have to plead in order for it ---- In other words, he has to demonstrate that this was a judgment in his favor in this particular matter. All right. I suggest to the Court ---- And he didn't plead. That's right. The pleas were all against the other three. That's correct, Your Honor. But we have to look at the consideration. Otherwise, you're out. I suggest that it's a settlement of the entire criminal proceedings. I think what Judge Feig is saying is that it is clear on this. You're making it harder for yourself than you need to. I understand. Because on this record, it is stated that if this check doesn't clear, the charges are going to be reinstated and he is going to waive a preliminary injunction. And so he has given up something. Yes. He gave up his right to a preliminary hearing, a speedy trial. There was other criminal proceedings that he was giving up in the course of this reinstate if the checks did not, in fact, clear. But in addition there, too, we have the global settlement of this particular matter also is what I'm trying to indicate to the Court. There is a global settlement. I guess feeling your nagging deceit, defeat from the jaws of victory. That was going through my mind, Your Honor, and I apologize. I was going to say that, too, but I feel it. I've been known to do that. I'm in a bad mood this morning. The Court, I mean, the effect of California law. When you want to give him his money back, go ahead. Maybe it would be well to step down. Yes, Your Honor. And the Court's suggestion. Thank you very much. All right. Your Honor, to answer some of your concerns, the record testimony was that the money did come from the fundraising companies. Docket number 102, page 46 of Mr. Jaisinghani's deposition. Question. The money that was used by International Plastics to pay their fees of various forms, the checks that had to be paid at the time they entered their no contest plea. Where did that money come from? Answer. It came from a fundraising company. Question. What fundraising company is that? Answer. It was a fundraising company in Illinois called Veterans Assistance Corporation. Did it come from any other source? No. I think it came only from that source. Question. What was your role in getting this money for IPP to use to pay what it needed to pay? Why would you use money from a fundraising source? Because that fundraising company had an ongoing business relationship with Art Vyas. Art Vyas was doing fundraising. You got money for veterans and you use it to pay this off? As part of the fundraising, they give away trash bags. So there was a relationship between International Plastics. Give away what? Trash bags as an incentive. Trash bags? Yes. They say you donate 25 bucks, you get a box of trash bags. So the fundraising company, to raise the money, had bought inexpensive trash bags from International Plastics, which was making the trash bags. So that was the relationship. There was an ongoing relationship that the fundraising companies owed money, in a sense, or were continuing to do business with Art Vyas. So why did the fundraising companies put the money in? The fundraising companies, because they... Did they owe the trash bag companies the money? Is that it? Well, Jack Rust had a relationship with the fundraising companies. There was testimony that he had a position with them. And there was also testimony that these fundraising companies, as I said, were getting the trash bags. And they were getting them from Art Vyas, who was manufacturing them. And so they were getting these bags cheaply from Art Vyas. So as a favor to him, to get him off the hook, they loaned him the money so that he could get off the hook criminally. Were these fundraising companies, were they non-profits? They were non-profits, yes. Is that legal? It is perfectly legal. They're registered in the states where they do fundraising. They provide an incredibly great public service by raising money for the Veterans of Foreign Wars, the VFW, providing services and benefits to those veterans who fought for our country. In order to pay off $150,000 to a plastic company? Is this what they're raising it for? Yeah. The fundraising companies are entitled to deduct their ongoing expenses. It's very disturbing because the record makes quite plain what the answer to these inquiries are, which is that it was a loan to him. He said so, and he had an obligation to pay it back. That's what he said. He said in this deposition, and he also said in his affidavit, that it was the fundraising companies that loaned the money that he assisted. He was a consultant to them, and he encouraged them to loan the money to Art Vyas. To whom? The fundraising companies, Veterans Assistance. The checks were paid from an account from Veterans Assistance Corporation. Those were the face of the checks. Does the VFW know about this? The VFW gets full, complete accounting of every action that the fundraising company takes. They have full, complete access to their records. They're dying to get this service because it's very hard to raise money for veterans because people only want to give small amounts of money. It's a very labor-intensive process. That's not the question. The question is whether they knew that they were giving away money as opposed to loaning money to somebody. It's one thing to loan money to somebody to pay a fine. If you think you're going to get it back, it's another thing to just give it away. Well, the testimony was that it was a loan from the fundraising companies, and there would be an obligation to pay it back. And I think that may have been the case. But the bottom line is, and that's why I don't think it's worth going on, that there was evidence in the record that it was a loan to him, and the fact finder was entitled to rely on it. There might have been other evidence, but so what? Actually, the testimony, the record evidence is that it was a loan from the fundraising companies. To whom? You told me that these payments amounted to loans to you. Right. For these amounts, right. Yes, yes. You understand that you are obligated to pay these amounts. Is that correct? Absolutely with interest. All right. And you say now we said something else that's another point, but so what? This is in the record. Actually, that deposition is from a different case. That's not from this case. So what? It's in the record in this case, is it not? It's in the record in this case, yes. All right. So that's the answer. So that's the end of it. That testimony is that there was a loan to Mr. Jetsingani was not obligated to pay the money. There's no question about that. He said that three or four times. Yes. And he was not required to do anything with the drums. The government had decided we don't have a case against him. We're going to collect our money from these other defendants just for investigative costs. You told us that. See, you're 11 minutes and 28 seconds in the hole. Next time you have an oral argument, we'll deduct it. Okay. That's it. Thank you. Thank you, Your Honor. Case is submitted. Thank you. Thank you. In the second matter, Moore v. Avery, that's submitted. Now we come to number three. United States v. Geminar Louise Irene. Good morning, Your Honors. Vince Bronco, Federal Defenders, on behalf of Miss...
judges: Hug, Pregerson, Berzon